UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PATRICK BRADY,

        Plaintiff,

   v.

SCOTT JONES, et al.,

        Defendants.

No.  2:21-cv-0489 TLN AC P

ORDER AND FINDINGS AND RECOMMENDATIONS

Plaintiff is a state and federal prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983, which challenges his former conditions of confinement as a federal pretrial detainee at the Sacramento County Main Jail.  Currently before the court are defendants' motions for summary judgment (ECF No. 61) and to strike plaintiff's evidence in opposition to summary judgment (ECF No. 66).  For the reasons discussed below, defendants' motion to strike is denied. It is recommended that defendants' motion for summary judgment be granted in part and denied in part.

I.    Background

    A.    Allegations of the First Amended Complaint

The first amended complaint ("FAC") alleges that defendants violated plaintiff's constitutional rights in various ways during plaintiff's federal pretrial detention in the Sacramento County Jail ("Sac Main Jail"), beginning in June 2019.  ECF No. 16.  At that time, plaintiff was

facing potentially capital charges in United States v. Yandell, et al., Case No. 2:19-cr-0107 KJM

(E.D. Cal.) ("Pl's RICO case"), which alleged participation in a racketeering conspiracy that

involved murder and drug distribution.[1]  The government alleged that plaintiff is an Aryan

Brotherhood member who, while a state prison inmate, murdered another prisoner as part of the

conspiracy.  See Case No. 2:19-cr-0107 KJM, ECF No. 1.  Plaintiff was transferred from the

custody of the California Department of Corrections and Rehabilitation to the custody of the U.S.

Marshal for purposes of the federal prosecution.  ECF No. 16 at 2.[2]  As the court noted in the

screening order, the USMS contracts with Sacramento County for the housing of federal pretrial

detainees at the county jail.  ECF No. 20 at 3.

The FAC presents four claims, the first three of which remain before the court.[3]  Claim

One asserts that defendants Jones, Luke, Hampton,[4] Pfau and Sgt. Saika violated plaintiff's due

process rights by placing him in the jail's Total Separation Unit ("T-Sep"), also identified as pod

8W400 and/or ADSEG-1, without proper justification and by denying his various grievances

challenging that placement.  Id. at 9-13.  In T-Sep plaintiff was single-celled and kept inside his

cell for 22 hours a day.  Id. at 8.  He had no direct exposure to sunlight and fresh air and no

opportunity to congregate or program with others.  Id. at 8, 13.  Defendants justified this

placement on grounds that plaintiff has been validated as an Aryan Brotherhood gang member

and on grounds of his criminal history and unspecified past behavior.  Id. at 10.  Defendants

---

[1]  The undersigned takes judicial notice of proceedings in United States v. Yandell, et al., Case No. 2:19-cr-0107 KJM (E.D. Cal.) ("Pl's RICO case").  See Fed. R. Evid. 201(b)(2); United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) ("The court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (citations omitted).

[2]  "ECF" refers to the Electronic Court Filing system.  Pages numbers refer to those generated by ECF and not to the page designations assigned by the parties in their filings.

[3]  Claim Four alleged that defendants Jones, Luke, Fisher, Villanueva and Headly demonstrated deliberate indifference to plaintiff's safety by placing him in a cell that locked from the outside by a padlock, and by denying his grievances of this issue.  Id. at 19-22.  This court previously found that these allegations failed to state a claim for relief, ECF Nos. 20 & 22, and the Ninth Circuit has affirmed that decision, ECF No. 32 at 2.

[4]  Plaintiff misspells defendant Hampton's name in the FAC.  See ECF No. 16 at 5, 9, 13, 15-16, 18 (referring to defendant Hamptun).  The court uses the correct spelling, Hampton, throughout.

2

1   explained that Aryan Brotherhood affiliated co-defendants in plaintiff's RICO conspiracy case

2   were separately housed in T-Sep in light of their histories, the charges against them, and their

3   criminal sophistication.  Id.  This basis for plaintiff's segregation was contrary to jail policy that

4   says restricted housing is limited to "extraordinary circumstances" such as recent assaultive

5   behavior.  Id. at 11.  Plaintiff had no disciplinary infractions at the jail.  Id.  Also, defendants

6   relied on plaintiff's custodial history at CDCR when the policy specifies that placement in

7   restrictive housing is to be based on recent conduct and not past behavior.  Id. at 10-11.  Due

8   process was further violated by the county policy of giving jail officials discretionary authority to

9   override the official policy's limitations on T-Sep placement.  Id. at 12.

10      Claim Two alleges that defendants Jones, Luke and Hampton violated plaintiff's First

11  Amendment right to confidential legal visits.  Id. at 13-16.  Conversations in the 8 West

12  visiting Booths Q and R could be and were easily overheard by people outside the booths.  Id. at

13  13, 15.  This had a "chilling effect" on plaintiff's ability to discuss mitigation in his death penalty

14  eligible case and other case -related matters with his attorneys.  Id. at 13-16.

15      Claim Three alleges that defendants Jones, Hampton and Meeks violated plaintiff's rights

16  by video recording plaintiff's meetings with his legal team at the jail.  Id. at 16-19.  Cameras were

17  installed in a legal visiting booth that was converted into a social visiting booth for high security

18  inmates.  Id. at 16.  These cameras were operational while the booth was still being used for

19  confidential legal visits, and plaintiff's legal visits were video recorded on four occasions.  Id. at

20  16-17.  Plaintiff experienced a "chilling effect" on his ability to discuss his case and the

21  development of a mitigation strategy with his lawyers.  Id. at 19.

22      By way of relief, plaintiff seeks an order declaring that defendants violated his

23  constitutional rights; requiring "defendants, their agents, subordinates, employees, and all others

24  acting in concert with them to cease their unlawful and unconstitutional practices and remedy

25  their violations"; requiring defendants to restore plaintiff's rights and privileges; and awarding

26  plaintiff reasonable costs and fees and any other relief as the court may deem fit.  Id. at 23.

27          B.      Relevant Procedural History

28      The undersigned screened the FAC and recommended that it be dismissed without leave

3

1  to amend because plaintiff failed to state any claims against any defendants and amendment

2  would be futile.  ECF No. 20.  Specifically, with respect to Claim One, the court found that

3  "[b]ecause the face of the FAC demonstrates the existence of a patently rational penological

4  purpose for plaintiff's housing status, and no facts demonstrate a punitive intent on the part of any

5  defendant, plaintiff cannot state a constitutional claim."  Id. at 7.  With respect to Claims Two and

6  Three, the court found that plaintiff failed to state Sixth Amendment or denial of access to court

7  claims because "[p]laintiff cannot demonstrate any concrete prejudice to his defense against the

8  criminal charges he faces, because the criminal case is far from concluded.  Although the FAC

9  articulates a legitimate grievance, it does not identify a completed constitutional injury that can be

10  redressed under § 1983."  Id. at 8.  Lastly, the court found that Claim Four failed because plaintiff

11  failed to demonstrate that he was "exposed, or is being exposed, to a substantial risk of serious

12  harm."  Id. at 9.  The district judge adopted the findings and recommendations in full, ECF No.

13  23, and plaintiff appealed, ECF No. 25.

14      The Ninth Circuit affirmed the district court's dismissal of Claim Four, but reversed

15  judgment with respect to Claims One, Two, and Three, and remanded the case.  ECF No. 32. The

16  Ninth Circuit found that "liberally construing" Claim One, plaintiff's allegations that the reasons

17  given for his placement in T-Sep did not justify such a restrictive housing designation were

18  sufficient to state a claim.  Id. at 2-3.  With respect to Claims Two and Three, the Ninth Circuit

19  found that to state a claim for violation of the attorney-client confidentiality under the First and

20  Sixth Amendments, plaintiff does not need to show actual injury to a legal claim.  Id. at 3.

21      Once the case was remanded and discovery concluded, defendants filed a motion for

22  summary judgment.  ECF No. 61.  Plaintiff filed an opposition, and defendants replied.  ECF

23  Nos. 64, 65.  Defendants also filed a motion to strike several pieces of plaintiff's evidence in

24  support of his opposition to defendants' motion for summary judgment.  ECF No. 66.  The

25  motion to strike is fully briefed.  See ECF Nos. 67, 68.

26  ////

27  ////

28  ////

4

1    II.    Motion to Strike

2        A.   Overview

3        Defendants move to strike Exhibits H, I, and J to plaintiff's opposition to summary

4    judgment.  ECF No. 66-1.  The motion states that it is brought pursuant to Fed. R. Civ. P. 37, and

5    it seeks exclusion of the exhibits on the primary ground that they were not produced in discovery.

6    Id. at 2, 4-6.  The motion also asserts miscellaneous evidentiary objections to the exhibits.  Id. at

7    6-7.  These are also addressed below.

8        B.   Legal Standards

9        "[A]n action brought without an attorney by a person in the custody of the United States, a

10    state, or a subdivision" is exempt from the initial disclosure requirements of Federal Rule of Civil

11    Procedure 26(a).  Fed. R. Civ. P. 26(a)(1)(B)(iv).  However, Federal Rule of Civil Procedure

12    26(e) states that "[a] party who has made a disclosure under Rule 26(a)—*or who has responded*

13    *to an interrogatory, request for production, or request for admission*—must supplement or

14    correct its disclosure or response: (A) in a timely manner if the party learns that in some material

15    respect the disclosure or response is incomplete or incorrect, and if the additional or corrective

16    information has not otherwise been made known to the other parties during the discovery process

17    or in writing[.]"  Fed. R. Civ. P. 26(e) (emphasis added).

18        Federal Rule of Civil Procedure 37 "gives teeth" to Rule 26's disclosure requirements,

19    and is a "self-executing," "automatic" sanction.  Goodman v. Staples the Off. Superstore, LLC,

20    644 F.3d 817, 827 (9th Cir. 2011).  If a party fails to provide information in compliance with Rule

21    26(a), "the party is not allowed to use that information or witness to supply evidence on a motion,

22    at a hearing, or at a trial, *unless* the failure was substantially justified or is harmless." Fed. R. Civ.

23    P. 37(c)(1); see also Goodman, 644 F.3d at 827 ("The only exceptions to Rule 37(c)(1)'s

24    exclusion sanction apply if the failure to disclose is substantially justified or harmless.").  The

25    party facing exclusionary sanctions for belated disclosure has the burden to show that its failure to

26    comply with Rule 26 was justified or harmless.  Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,

27    259 F.3d 1101, 1107 (9th Cir. 2001).

28    ////

1

2

3

4

> Among the factors that may properly guide a district court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure that prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence.

5    Lanard Toys, Ltd. v. Novelty, Inc., 375 Fed. App'x 705, 713 (9th Cir. 2010).  In contrast, "[i]f a

6    party fails to admit what is requested under Rule 36 and if the requesting party later

7    proves . . . the matter true, the requesting party may move that the party who failed to admit pay

8    the reasonable expenses . . . ."  Fed. R. Civ. P. 37(c)(2).

9        C.   Discussion
            1.    Plaintiff's Exhibit H: Declarations Regarding Confidentiality of Attorney

10               Visiting Booths

11          Exhibit H to plaintiff's opposition is a compilation of nine declarations, all of which

12   address the lack of confidentiality for attorney client communications in the portion of the Sac

13   Mail Jail where plaintiff was housed.  ECF No. 64 at 102-124.  The declarations are from some of

14   plaintiff's co-defendants as well as attorneys, paralegals and investigators who worked on the

15   case.  Id.  Defendants contend that these declarations should be excluded as a sanction for

16   plaintiff's failure to produce them in response to Special Interrogatories Nos. 1 and 2.  See ECF

17   No. 66-1 at 3.

18          The court rejects this argument.  Both of the referenced interrogatories sought information

19   about witnesses who had overheard the specific attorney-client conversations that the FAC

20   alleges had been compromised by lack of confidentiality.[5]  None of the declarations comprising

21   plaintiff's Exhibit H report that the declarant overheard any of the four conversations between

22   plaintiff and his legal team that are at issue in Claims Two and Three.  Rather, these declarants

23   state that when *they* used Booths Q and/or R and were inside those booths they could hear

24

_____

25   [5]  Special Interrogatory No. 1 stated, "IDENTIFY any witnesses that overheard any of the four

26   discussions YOU alleged were compromised in your COMPLAINT."  Special Interrogatory No. 2 stated, "For each person YOU IDENTIFIED in YOUR response to Special Interrogatory No. 1,

27   describe with specificity, the date the witness overheard and what the witness told you they overheard."  Id.; see also ECF No. 66-3, Exhibit 2, Plaintiff's Written Discovery Responses, at

28   207.

6

1    conversations happening in other booths and the social visiting area.  See ECF No. 64 at 109-124,

2    Pl's Exhibit H.  The declarations are not responsive to the interrogatories, so plaintiff had no

3    obligation to produce them and cannot be sanctioned for failing to do so.

4        Defendant contends further that Exhibit H should be excluded as a sanction for plaintiff's

5    failure to withdraw his admission that he has no evidence that any witness overhead his privileged

6    communications at the jail.  ECF No. 61-1 at 4, 6-7.  This argument is based on the same error

7    identified as to the interrogatories.  Exhibit H is not evidence that other people overheard

8    plaintiff's conversations with his legal team, it is evidence that the legal visiting booths were not

9    soundproof and therefore did not protect confidentiality.  There is no discovery violation to

10    sanction.[6]

11        Apart from these Rule 37 issues, defendants contend that Exhibit H should be excluded on

12    grounds that it lacks foundation and is not based on personal knowledge.  In reviewing

13    evidentiary objections at summary judgment, courts "focus on the admissibility of its contents"

14    and not "on the admissibility of the evidence's form."  Fraser v. Goodale, 342 F.3d 1032, 1036

15    (9th Cir. 2003).  Even if the non-moving party's evidence is presented in a form that is currently

16    inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the

17    moving party's objections could be cured at trial.  Burch v. Regents of Univ. of California, 433 F.

18    Supp. 2d 1110, 1119-20 (E.D. Cal. 2006).  Accordingly, courts in this circuit routinely overrule

19    objections based on lack of foundation, lack of proper authentication, and hearsay.  See Chavez v.

20    Ford Motor Credit Company, LLC, No. 1:23-cv-1205 SKO, 2025 WL 1001587 at *1, 2025 U.S.

21    Dist. LEXIS 64222 at *2-3 (E.D. Cal. Apr. 3, 2025) (citing cases in this district and the Central

22    District of California); Morton v. Cnty. of San Diego, No. 21-cv-1428 MMA DDL, 2024 WL

23    5126281 at *4, 2024 U.S. Dist. LEXIS 227241 at *12 (S.D. Cal. Dec. 16, 2024) ("objections for

24    lack of foundation . . . are not appropriate at summary judgment").

25        The objection for lack of foundation is overruled in accordance with these principles.

26    _____

27    [6]  In any event, Rule 37 does not provide for exclusionary sanctions where there has been a failure
     to admit.  Fed. R. Civ. P. 37(c)(2) (providing only for monetary sanctions in failure to admit
     context); compare Rule 37(c)(1) (providing for exclusionary as well as monetary sanction for

28    failure to disclose or supplement).

1  Defendants argue that the declarations are not based on the personal knowledge of the declarants

2  that plaintiff's attorney-client conversations were overheard.  ECF No. 61-1 at 6.  While true, that

3  is not the point.  The declarations contain facts establishing that the declarants each have personal

4  knowledge of sound carrying to and/or from the visiting booths in 8 West 400-Pod.  That is the

5  subject of the declarations, and the personal knowledge of the declarants on that issue is not

6  subject to reasonable dispute.  Any opinions expressed as to the general confidentiality of

7  attorney-client communications in the booths are lay opinions based on the personal experiences

8  and perceptions of the declarants, and therefore not categorically inadmissible.  See Fed. R. Evid.

9  701.[7]

10                        2.       Plaintiff's Exhibit I: Photographs of Social Visiting Slots and Legal
                                   Visiting Booths
11

12        Exhibit I is a compilation of photographs identified as 8 West social visiting slots and

13  legal visiting booths.  ECF No. 64 at 125-134.  Defendants contend that Exhibit I should be

14  stricken because plaintiff failed to lay a proper foundation.  ECF No. 66-1 at 6; ECF No. 68 at 3.

15  It appears the contents of Exhibit I could be presented in admissible form at trial.  Accordingly,

16  defendants' motion to strike Exhibit I will be denied.

17                        3.       Plaintiff's Exhibit J: Memorandum Regarding Confidentiality in Legal
                                   Visiting Booth
18

19        Plaintiff's Exhibit J is a memorandum by paralegal Ashley Benny regarding a visit that

20  she and investigator Ken Addison made to Mr. Brady in 8 West.  The memo reports on the

21  audibility of conversation within the legal visit booth from various locations outside the booth.

22  ECF No. 64 at 135-137.  Defendants argue that the memo should be stricken because (1) plaintiff

23  failed to disclose it in response to discovery requests, (2) plaintiff failed to withdraw his

24  admission that he did not have any evidence that any witnesses overheard his privileged

25  _____

26  [7]  See 2:19-cr-107 KJM, ECF No. 895 at 2 (denying codefendant Corbett's request for an order
     permitting an inspection by an industrial hygienist because "[l]ay witnesses can give admissible
27  testimony about what they can hear without relying on 'scientific, technical, or other specialized
     knowledge.'  Fed. R. Evid. 701(c).  The sounds a person can and cannot hear are 'personal
28  knowledge.'  Fed. R. Evid. 602.").

1  communication, (3) plaintiff failed to authenticate the exhibit, (4) it was created after plaintiff

2  filed the complaint, and (5) it presents testimony from lay witnesses who do not have expertise to

3  conduct or recreate sound tests.  ECF No. 61-1 at 5-6.

4       Defendants' Rule 37 arguments are rejected for the reasons already explained as to

5  Exhibit H.  The Benny memorandum is simply not responsive to discovery requests regarding

6  witnesses to the specific, allegedly overheard conversations between plaintiff and his lawyers

7  which form the factual basis of plaintiff's claims for relief.  The court does not understand

8  defendants' additional argument that the Benny memo should have been disclosed in response to

9  discovery requests seeking information related to damages, see ECF No. 61-1 at 5, as Exhibit J

10  does not address damages.  There is no discovery violation subject to sanctions.[8]

11       Defendants' authentication objection is overruled because it appears the contents of

12  Exhibit J could be presented in an admissible form at trial.  The court also rejects defendants'

13  argument that Exhibit J should not be considered because it was created after the complaint was

14  filed in this case.  Defendants do not contend that the conditions in legal booths Q or R had

15  changed by the time Exhibit J was created, such that testimony about what could or could not be

16  heard at that time would be irrelevant or unreliable as to what could or could not be heard at the

17  time plaintiff filed his complaint.  In any event, such considerations would go to the weight of the

18  evidence rather than its admissibility.

19       Finally, the court rejects defendants' argument that Exhibit J should not be considered

20  because lay witnesses do not have the expertise to conduct or recreate sound tests.  Ms. Benny

21  does not represent that she conducted any scientific sound tests that would have required

22  expertise.  "The sounds heard, and the beliefs formed as a result of these sounds, are admissible

23

24  [8]  Moreover, to the extent if any that defendants have a basis for seeking exclusion on the general grounds that they have not seen Exhibit J previously, there is no prejudice.  Ms. Benny's

25  declaration, which is included in Exhibit H and covers substantially similar ground, had been submitted in plaintiff's criminal case in support of a motion seeking an expert to conduct sound

26  testing of the legal booths in question.  See Pl's RICO case, ECF No. 753 at 15-16.  Benny's identity as a witness to the general lack of confidentiality in 8 West legal visiting booths was

27  therefore known or should have been known to defendants.  Because the observations described Exhibit J are of the same general nature as those contained in Benny's previous declaration, and

28  her identity was known, any failure to disclose Exhibit H was harmless.

1   [as] lay witness testimony."  <u>Nash-Perry v. City of Bakersfield</u>, No. 1:18-cv-1512 JLT CDB,

2   2024 WL 115211 at *11, 2024 U.S. Dist. LEXIS 5393 at *31 (E.D. Cal. Jan. 10, 2024) (citing

3   <u>United States v. Durham</u>, 464 F.3d 976, 982 (9th Cir. 2006)).  The district judge in plaintiff's

4   criminal case indicated the same view.  <u>See</u> Pl's RICO case, ECF No. 895 ("Lay witnesses can

5   give admissible testimony about what they can hear without relying on 'scientific, technical, or

6   other specialized knowledge.' Fed. R. Evid. 701(c).  The sounds a person can and cannot hear are

7   'personal knowledge.' Fed. R. Evid. 602.").

8          III.    <u>Motion for Summary Judgment</u>

9                  A.    <u>Standards on Summary Judgment</u>

10          Summary judgment is appropriate when the moving party "shows that there is no genuine

11   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

12   Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden

13   of proving the absence of a genuine issue of material fact."  <u>In re Oracle Corp. Sec. Litig.</u>, 627

14   F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The

15   moving party may accomplish this by "citing to particular parts of materials in the record,

16   including depositions, documents, electronically stored information, affidavits or declarations,

17   stipulations (including those made for purposes of the motion only), admissions, interrogatory

18   answers, or other materials" or by showing that such materials "do not establish the absence or

19   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

20   support the fact."  Fed. R. Civ. P. 56(c)(1).

21          "Where the non-moving party bears the burden of proof at trial, the moving party need

22   only prove that there is an absence of evidence to support the non-moving party's case."  <u>Oracle</u>

23   <u>Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56(c)(1)(B).

24   Indeed, summary judgment should be entered, "after adequate time for discovery and upon

25   motion, against a party who fails to make a showing sufficient to establish the existence of an

26   element essential to that party's case, and on which that party will bear the burden of proof at

27   trial."  <u>Celotex</u>, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element

28   of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u> at 323.  In such

1    a circumstance, summary judgment should "be granted so long as whatever is before the district

2    court demonstrates that the standard for the entry of summary judgment, as set forth in Rule

3    56(c), is satisfied." Id.

4         If the moving party meets its initial responsibility, the burden then shifts to the opposing

5    party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

6    Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the

7    existence of this factual dispute, the opposing party may not rely upon the allegations or denials

8    of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

9    admissible discovery material, in support of its contention that the dispute exists. See Fed. R.

10   Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a

11   fact "that might affect the outcome of the suit under the governing law," and that the dispute is

12   genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving

13   party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

14        In the endeavor to establish the existence of a factual dispute, the opposing party need not

15   establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

16   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

17   trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)

18   (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Thus, the

19   "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see

20   whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal

21   quotation marks omitted).

22        "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

23   court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls

24   v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the

25   opposing party's obligation to produce a factual predicate from which the inference may be

26   drawn. See Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to

27   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

28   some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations

1   omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the

2   non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391

3   U.S. at 289).

4       B.   Exhaustion of Administrative Remedies

5           1.   Overview

6   Defendants seek summary judgment on the ground that plaintiff's claims are

7   administratively unexhausted. Their argument is based on plaintiff's failure to appeal the denial

8   of any of the three grievances he submitted at the jail. Plaintiff contends that the administrative

9   process was effectively unavailable to him, excusing exhaustion. Plaintiff argues that the process

10  was confusing, that he was misled by jail staff about the exhaustion process, and that he was

11  affirmatively told that the issues he sought to raise were "non-grievable."

12          2.   Exhaustion Requirement of the Prison Litigation Reform Act

13  Because plaintiff is a prisoner suing over the conditions of his confinement, his claims are

14  subject to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Under the PLRA,

15  "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or

16  any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

17  such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); Porter v.

18  Nussle, 534 U.S. 516, 520 (2002) ("§ 1997e(a)'s exhaustion requirement applies to all prisoners

19  seeking redress for prison circumstances or occurrences"). "[T]hat language is 'mandatory': An

20  inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent

21  exhaustion of available administrative remedies." Ross v. Blake, 578 U.S. 632, 638 (2016)

22  (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006)).

23  Failure to exhaust is "an affirmative defense the defendant must plead and prove." Jones

24  v. Bock, 549 U.S. 199, 204, 216 (2007). "[T]he defendant's burden is to prove that there was an

25  available administrative remedy, and that the prisoner did not exhaust that available remedy."

26  Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc) (citing Hilao v. Estate of Marcos,

27  103 F.3d 767, 778 n.5 (9th Cir. 1996)). "[T]here can be no 'absence of exhaustion' unless *some*

28  relief remains 'available.'" Brown v. Valoff, 422 F.3d 926, 936 (9th Cir. 2005) (emphasis in

                                                  12

1    original).  Therefore, the defendant must produce evidence showing that a remedy is available "as

2    a practical matter," that is, "it must be capable of use; at hand."  <u>Albino</u>, 747 F.3d at 1171

3    (citation and internal quotations marks omitted).  "[A]side from [the unavailability] exception, the

4    PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special

5    circumstances.'"  <u>Ross</u>, 578 U.S. at 639.  "[M]andatory exhaustion statutes like the PLRA

6    establish mandatory exhaustion regimes, foreclosing judicial discretion."  <u>Id.</u> (citation omitted).

7        For exhaustion to be "proper," a prisoner must comply with the institution's procedural

8    rules, including deadlines, as a precondition to bringing suit in federal court.  <u>Woodford</u>, 548 U.S.

9    at 90 ("Proper exhaustion demands compliance with an agency's deadlines and other critical

10    procedural rules.").  "[I]t is the prison's requirements, and not the PLRA, that define the

11    boundaries of proper exhaustion."  <u>Jones</u>, 549 U.S. at 218.

12        As long as some potential remedy remained available through the administrative appeals

13    process, even if it was not the remedy he sought, plaintiff is required to exhaust his remedies.

14    <u>Booth v. Churner</u>, 532 U.S. 731, 741 & n.6 (2001) ("Congress has provided in § 1997e(a) that an

15    inmate must exhaust irrespective of the forms of relief sought and offered through administrative

16    avenues.").  The Supreme Court has identified "three kinds of circumstances in which an

17    administrative remedy, although officially on the books, is not capable of use to obtain relief."

18    <u>Ross</u>, 578 U.S. at 643.  "First, . . . an administrative procedure is unavailable when (despite what

19    regulations or guidance materials may promise) it operates as a simple dead end—with officers

20    unable or consistently unwilling to provide any relief to aggrieved inmates."  <u>Id.</u> (citing <u>Booth</u>,

21    532 U.S. at 736).  "Next, an administrative scheme might be so opaque that it becomes,

22    practically speaking, incapable of use."  <u>Id.</u>  Finally, administrative remedies are unavailable

23    "when prison administrators thwart inmates from taking advantage of a grievance process through

24    machination, misrepresentation, or intimidation."  <u>Id.</u> at 644.

25        When the district court concludes that the prisoner has not exhausted administrative

26    remedies on a claim, "the proper remedy is dismissal of the claim without prejudice."  <u>Wyatt v.</u>

27    <u>Terhune</u>, 315 F.3d 1108, 1120 (9th Cir. 2003) (citation omitted), <u>overruled on other grounds by</u>

28    <u>Albino</u>, 747 F.3d at 1168.

1      3.  Facts Related to Exhaustion[9]

2          a. Grievances Related to ADSEG 1 Housing

3      Plaintiff filed three grievances regarding his ADSEG 1 housing designation: (1) Grievance

4  No. 2020-2269 on August 17, 2020 (2) Grievance No. 2021-786 on February 15, 2021; and (3)

5  Grievance No. 2021-2764 on July 2, 2021.  DSUF No. 14.[10]

6      In his August 2020 Grievance, plaintiff complained about being moved to different cells

7  as a form of harassment.  DSUF No. 15; ECF No. 61-4 at 136-37.  At the top of the form plaintiff

8  wrote: "* COMMANDERS LEVEL REVIEW *."  Plaintiff stated that "over 2 weeks ago I filed a

9  grievance on being moved to different cells for no reason.  I've gotten no reply and I am now

10 appealing the issue to the commander[] (Per Jail Manual)."  Id. at 136.  The response and reply

11 provided by jail officials both indicate the issue is "Not Grievable" and are signed by the assistant

12 commander and defendant Saika, who is a sergeant.  Id.  at 136, 137.  The reply form states there

13 is nothing that prevents plaintiff from being moved frequently and

14          [I]nmates housed in 8 West 400 pod are validated members or
           associated of [sic] the Aryan Brother prison gang. All inmates, with
15          the exception of one inmate, are facing the same federal RICO
           charges. Based on their current charges, previous criminal history

16 ─────────────────

17 [9]  Unless otherwise specified, the following facts are either expressly undisputed by the parties or
   have been determined by the court, upon full review of the record, to be undisputed by competent
18 evidence.  The court notes that plaintiff has failed to file a separate document in response to
   defendants' statement of undisputed facts that identifies which facts are admitted and which are
19 disputed, as required by Local Rule 260(b).  "Pro se litigants must follow the same rules of
   procedure that govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987)
20 (citation omitted), overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896 (9th Cir.
   2012) (en banc).  However, it is well-established that district courts are to "construe liberally
21 motion papers and pleadings filed by pro se inmates and should avoid applying summary
   judgment rules strictly."  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The
22 unrepresented prisoner's choice to proceed without counsel "is less than voluntary" and they are
   subject to "the handicaps . . . detention necessarily imposes upon a litigant," such as "limited
23 access to legal materials" as well as "sources of proof."  Jacobsen v. Filler, 790 F.2d 1362, 1364
   n.4 (9th Cir. 1986) (alteration in original) (citations and internal quotation marks omitted).
24 Inmate litigants, therefore, should not be held to a standard of "strict literalness" with respect to
   the requirements of the summary judgment rule.  Id. (citation omitted).  Accordingly, the court
25 considers the record before it in its entirety despite plaintiff's failure to be in strict compliance
   with the applicable rules.  However, only those assertions in the opposition which have
26 evidentiary support in the record will be considered.
27 [10]  The first documented grievance references a previously submitted one, but no earlier grievance
   has been produced.
28

                                    14

1

2

and past histories of incarceration in CDCR, all inmates have been housed individually in the 8 West 400 pod since approximately June of 2019.

3    Id. at 137.

4        In plaintiff's February 15, 2021, Grievance No. 2021-786, he alleged that he had been

5    housed since June of 2019 in a disciplinary/isolation pod, and that he had never had a hearing or a

6    disciplinary write up to warrant such placement.  DSUF No. 16; ECF No. 61-4 at 131-32.

7    Plaintiff's grievance states that he is not allowed contact with any other person, he has not been

8    allowed outside in four months, and he is moved to unclean and unsanitary cells every two weeks.

9    Id. at 131.  The reply form states,

10

11

12

13

Here, at the Sacramento County Main Jail, minimum, medium and max are used to designate different classifications.  You are classified as a high. Due to your high level of criminal sophistication, charges, gang affiliation, criminal history, for the safety and security of the facility, other inmates, Deputies, and yourself, you will remain and [sic] ADSG 1 inmate for the duration of your stay here.

14   DSUF No. 16; ECF No. 61-4 at 132.  The response and reply were signed by the assistant

15   commander and defendant Pfau.  ECF No. 61-4 at 131-132.  The copy of this grievance provided

16   by defendants is marked on the face page as both denied and not grievable (with an illegible

17   annotation adjacent to the "not grievable" check mark) and on the response page as denied and

18   resolved.  Id.  The copy of the same document submitted by plaintiff includes only the first page,

19   which is marked denied and not grievable without the annotation.  ECF No. 64 at 31.[11]

20       Plaintiff's July 2, 2021, Grievance No. 2021-2764, alleged that his placement in "ad-seg is

21   unlawful" and that he "is requesting an immediate transfer to a g[eneral] p[opulation]."  DSUF

22   No. 17; ECF No. 61-4 at 140.  The grievance was forwarded to supervisor level.  Id.  The reply

23   form, signed by the assistant commander and non-defendant Rolland, is marked "Resolved" and

24

25   [11]  Plaintiff's exhibit is of poorer quality overall than defendants, and various markings (including

26   badge numbers, signatures and dates) appear only as faint smudges.  There appears to be a particularly faint smudge next to the "not grievable" indication, which may reflect that the

27   annotation visible on defendant's copy simply did not transfer to the copy provided to plaintiff. The parties do not address the discrepancy between exhibits, and there is no reason to believe that

28   plaintiff's version has been altered.

states that plaintiff was in ADSEG 1 because he is considered high notoriety inmate due to his case and criminal history.  Id. at 141.

None of the grievance responses provide instructions on how to appeal the grievance if plaintiff is dissatisfied with the response.  See ECF No. 61-4 at 131-32, 136-27, 140-41.

b. Grievance Regarding Attorney Visiting Booths

Plaintiff filed a single grievance complaining that conversations in the 8 West legal visiting booths could be overheard from outside; he requested a soundproof space in which to confer with members of his legal team.  ECF No. 61-4 at 134 (Grievance No. 2020-427, dated February 13, 2020).  The grievance was forwarded to the supervisor level and marked "resolved." Id.  The statement of resolution informed plaintiff that because social visiting booths adjacent to the legal booths had been shut down, plaintiff should have less of a problem "with being able to hear what is being said on a social visit."  Id. at 135.  Plaintiff was also advised to "lower[] your voice if it is a concern that someone will hear your conversation."  The correspondence concluded, "The attorney booths on the 8th floor are not going to be further soundproofed at this time.  This matter is considered closed."  Id.  The response was signed by Asst. Commander Hampton.  Id.  It did not include any information about the availability of further review.  Id.

c. Main Jail Inmate Handbook

The Sac Main Jail Inmate Handbook provides some guidance on what type of grievances may be filed and how to file a grievance.  ECF No. 61-6 at 11.  Grievances concerning conditions of confinement within the correctional facility that violate a prisoners' "personal, human, or constitutional rights" are grievable.  Id.  The handbook states, in pertinent part, the following:

> The inmate filing the grievance shall retain the pink copy of the form. A written response to a grievance shall be made within a reasonable amount of time.  Officers will make a reasonable effort to handle a grievance at the lowest level possible before sending it up the chain of command. . .
>
> If the officer cannot, or does not resolve the situation to your satisfaction, you may request an Inmate Grievance Form and file the completed form with a housing unit officer. . .
>
> Inmates dissatisfied with a grievance reply . . . may file an appeal in writing to the Facility Commander.

16

1        The appeal to the commander is called a Facility Commander's Appeal. A Facility Commander's Appeal must be filed within five
2        (5) days of the initial reply. The Facility Commander's appeal may be sent, Confidential Correspondence/legal mail to:
3
4        Facility Commander, Sacramento County Main Jail
       Sacramento County Sheriff's Office
       651 I Street
5        Sacramento, CA 95814

6 ECF No. 61-6 at 11-12.

7           4. Discussion

8       Defendants contend first that Claim One, challenging plaintiff's ADSEG 1 placement, is

9 unexhausted because plaintiff failed to appeal the denials of Grievances No. 2020-2269, No.

10 2021-786, and No. 2021-2764. Because the availability of further remedies is not established by

11 undisputed evidence, summary judgment should be denied on this issue.

12       Defendants flatly state in their reply brief that none of the grievances were marked "not

13 grievable" as plaintiff contends. ECF No. 65 at 8. That is false. The response to Grievance No.

14 2020-2269, produced by defendants, is plainly marked "not grievable" in two places. ECF No.

15 61-4 at 136, 137. Moreover, plaintiff clearly indicated on the face of this grievance that he was

16 seeking review at the "Commander Level," id. at 136, and such review is sufficient to exhaust

17 under the jail's policy. See ECF No. 61-6 at 12. Defendants make no argument that this

18 grievance was procedurally defective as a Facility Commander's Appeal. Nor do they present

19 evidence to contradict the assertion within the grievance itself that it followed, and sought higher

20 level review of, a previous grievance to which no response had been received. To the contrary,

21 the formal response to Grievance No. 2020-2269 specifies that it is intended to apply *both* to No.

22 2020-2269 itself *and* to a similar grievance that plaintiff had submitted on July 16, 2020, as well

23 as to similar grievances filed by plaintiff's co-defendants. ECF No. 61-4 at 137. Construing the

24 evidence in favor of the non-moving party as the court must do on summary judgment, Grievance

25 No. 2020-2269 may well have exhausted administrative remedies as to the issue. In the

26 alternative, the jails' response communicated that administrative remedies were unavailable.

27 Either way, summary judgment is inappropriate on this record.

28       The court's conclusion is further supported by the internally inconsistent response to

1   Grievance No. 2021-786, which was both denied *and* marked "not grievable."  ECF No. 61-4 at

2   131-132; ECF No. 64 at 31.  While it is entirely possible that the "not grievable" box was

3   checked in error, and that the annotations on defendant's copy of the exhibit indicate a

4   contemporaneous correction, that fact has not been established by undisputed evidence.  In any

5   event, an inmate receiving a response with the facial inconsistency and ambiguity of ECF No. 61-

6   4 at 131, especially after a previous grievance on the issue had been returned as "not grievable,"

7   would be justified in concluding that the appeals process was unavailable or ineffective.

8        Plaintiff has also declared that defendants Saika and Headly, as well as nondefendant

9   deputy Quillen, told him that the housing issue could only be addressed in court.  ECF No. 64 at

10  104 (Pl's Decl. ¶ 7).  His deposition testimony elaborated on this point.  Plaintiff testified he was

11  told "there was a murky, unwritten rule called the commander's level review" but "nobody could

12  show [him] where it was written down or anything like that" and that "the assistant commander

13  signing off on this means" he had received commander level review.  ECF No. 61-4 at 51-52 (Pl's

14  Depo. 49:21-50:1-10).  They also told him that "resolved" meant he could not take his grievance

15  any higher.  Id. at 90 (Pl's Depo. 88:20-24).  Plaintiff further testified that, "[he] took [the

16  grievance] as high as [he] thought [he] could, based on the information [he] was given" by

17  defendant Headley, an intelligence officer, and defendant Saika, a sergeant.  ECF No. 61-4 at 52,

18  (Pl's Depo. 50:6-24); see also id. at 69 (Pl's Depo. 67:14-19) ("When I asked them about a higher

19  level of grievance, or whatever, because – basically they – they couldn't give me anything

20  concrete or anything tangible that I could use to do that.  So that's as far as I thought I could take

21  it.").  To the extent defendants contest the accuracy of that testimony, a dispute of fact defeats

22  summary judgment rather than supporting it.  See Pearson v. Los Angeles County, No. 2:18-cv-

23  9065 SB (ADS), 2021 WL 6297882 at *2, 2021 U.S. Dist. LEXIS 249475 at *4-6 (E.D. Cal. Nov.

24  19, 2021) (finding a genuine issue of material fact regarding exhaustion in light of plaintiff's

25  deposition testimony that officers prevented him from exhausting his claim).

26       Taken as a whole, the evidence summarized above clearly precludes summary judgment.

27  See, e.g., Carr v. Carlyn, 699 Fed. App'x 722, 723 (9th Cir. 2017) (reversing grant of summary

28  judgment for failure to exhaust where the evidence that the grievance coordinator rejected two of

1    plaintiff's grievances as "not grievable" was "sufficient to raise a genuine dispute of material fact

2    as to whether the administrative remedies were effectively unavailable to plaintiff"); see also

3    Barnwell v. Williams, No. 20 C 7799, 2024 WL 4367688 at *4, 2024 U.S. Dist. LEXIS 178718 at

4    *11 (N.D. Ill. Oct. 1, 2024) ("By telling [plaintiff] his concerns were not grievable, despite being

5    so, the prison interfered with the grievance process in a manner that rendered it unavailable.").

6            The undersigned also rejects defendants' argument that receipt of the Inmate Handbook is

7    sufficient to establish that administrative remedies were available to plaintiff.[12]  The Inmate

8    Handbook lacks intelligible written guidance, making the administrative process opaque and

9    rendering it unavailable to plaintiff.  First, the Handbook does not define what it means when a

10   grievance is marked "Denied," "Not Grievable," or "Resolved," much less what it means when

11   two or three of these designations are simultaneously marked, or which of these dispositions are

12   appealable.  See ECF No. 61-6 at 11-12.  Second, the Handbook is less than clear on how many

13   levels of review are required for a claim to be exhausted.[13]  Third, the grievance procedures

14   articulated in the Handbook are inconsistent with the language of the grievance reply form (Form

15   7400-013A).[14]  For all these reasons, an inmate in plaintiff's situation would not necessarily know

16   _____

17   [12]  The court notes that although DSUF No. 36 states that plaintiff received the Inmate Handbook
      upon arrival at Sac Main Jail, defendants' evidence does not establish this fact.  The attestation

18   form cited to is dated June 28, 2019, but is not signed by plaintiff.  ECF No. 61-5 at 32.  A second
      attestation form, which defendants do not cite, has plaintiff's signature but no date.  Id. at 33.  The

19   court also notes that plaintiff testified that he did not receive the Inmate Handbook upon arrival at
      Sac Main Jail.  ECF No. 61-4 at 53, Pl's Depo. 51:11-20.

      [13]  The Inmate Handbook states: "[o]fficers will make a reasonable effort to handle a grievance at

20   the lowest level possible before sending it up the chain of command"; any complaints should be
      directed to the housing "floor officer"; "[i]f the officer cannot, or does not resolve the situation to

21   your satisfaction, you may request an Inmate Grievance Form and file the completed form with a
      housing unit officer"; and "[i]nmates dissatisfied with a grievance reply or those who feel they are

22   being retaliated against by any staff member may file an appeal in writing to the Facility
      Commander."  ECF No. 61-6 at 11-12.  The reference to an appeal to the Facility Commander is

23   buried in the text after a discussion regarding disability and sexual assault complaints, and within
      the section regarding retaliation complaints.

24   [14]  For example, the titles of reviewing officers for the grievance procedures articulated in the

25   Inmate Handbook do not match the titles of persons who review and sign the grievance reply
      form (Form 7400-013A).  The grievance process in the Inmate Handbook refers to "Floor

26   Officer," "Unit Officer," and "Facility Commander," while the grievance reply form refers to
      "Receiving Officer," "Responding Officer," "Shift Supervisor," "Shift Watch Commander," and

27   "Assistant Commander."  Neither define the terms "Floor Officer," "Unit Officer," "Facility

28   (continued…)

                                                19

1    from the Handbook whether further review was available or how to obtain it.

2           Finally, plaintiff's own experience demonstrates that the jail's administrative process

3    operated as a simple dead end.  See Ross, 578 U.S. at 643.  As discussed above, he received no

4    response to the grievance he submitted in July 2020, and in response to his subsequent request for

5    Facility Commander review he was informed his issue was non-grievable.  Plaintiff's deposition

6    testimony indicated that he attempted to appeal the denial of another, unrelated grievance and

7    never received a response.  ECF No. 61-4 at 52 (Pl's Depo. 50:25-51:3).  These considerations

8    support the conclusion that summary judgment is inappropriate here.  Cf. Peasley v. Spearman,

9    No. No. 18-56648, 2022 WL 2301992 at *2, 2022 U.S. App. LEXIS 17690 at *4-7 (9th Cir. June

10   27, 2022) (reversing dismissal of claim for failure to exhaust because the administrative

11   procedure "was so opaque as to be unavailable" where "a detailed review of the record and briefs

12   leaves us unable to determine whether and how Peasley should have filed his complaint, or if

13   such a complaint is even possible").

14          The opaqueness of the Inmate Handbook and plaintiff's empirical experience of the

15   grievance process as a dead end are also relevant to the question whether a remedial process was

16   available as a practical matter regarding the confidentiality of attorney-client visits.  Defendants'

17   motion asserts in a single conclusory paragraph that Claims Two and Three are unexhausted.

18   ECF No. 61-1 at 15.  Defendants rely entirely on plaintiff's failure to submit an appeal after his

19   grievance of the issue (Grievance No. 2020-427) was denied.  Id.  That theory is rejected for the

20   reasons explained above.  Defendants have not established their entitlement to summary judgment

21   on grounds of non-exhaustion.

22      C.   Claim One

23         1.  Overview

24          Claim One alleges that plaintiff's Fourteenth Amendment due process rights were violated

25   by his placement in ADSEG-1 (also known as the Total Separation Unit or T-Sep.)  ECF No. 16

26

27   Commander," "Receiving Officer," "Responding Officer," "Shift Supervisor," "Shift Watch
     Commander," and "Assistant Commander."  These inconsistencies result in confusion about what
28   level of review has been conducted and whether there is further review available.

1  at 9, 10.  The FAC alleges that plaintiff did not meet the jail's own criteria for such placement,

2  which limit ADSEG-1 to inmates recently involved in violence while in custody.  Id. at 11.

3  Specifically, plaintiff alleges that defendants placed him in ADSEG-1 on the basis of his past

4  behavior, gang affiliation and CDCR history rather than any recent conduct as required by the

5  applicable policy.  Id. at 11-12.  Plaintiff also challenges the "commander override" provision of

6  the policy which grants jail leadership discretion to authorize or continue ADSEG-1 placement

7  for reasons including "extraordinary safety risks."  Id. at 12.  The harsh conditions in ADSEG-

8  1—lack of sunlight and exercise, limited out of cell time, limited privileges and diminished

9  quality of life—are alleged as injuries suffered as the result of improper placement and

10  maintenance in ADSEG-1.  Id. at 13.

11     On screening, based on plaintiff's allegations and the FAC's own explicit framing of the

12  claim, the undersigned evaluated Claim One as challenging plaintiff's conditions of pretrial

13  confinement under Fourteenth Amendment standards.  See ECF No. 20 at 3 ("Plaintiff is a federal

14  pretrial detainee being held in the Sacramento County Jail, who challenges the conditions of his

15  confinement at the jail"), 5-6 (setting forth legal standards applicable to the rights of pretrial

16  detainees under the Fourteenth Amendment), 6-7 (finding that the factual allegations did not

17  establish a constitutional violation under those standards).  Claim One was found not to state a

18  claim for relief because the facts did not establish the punitive intent that is an essential element

19  of a Fourteenth Amendment claim;[15] the district judge agreed.  Id. at 7; see also ECF No. 23

20  (order adopting Findings and Recommendations).

21     In overruling this conclusion, the Ninth Circuit explained:

22     The district court dismissed Brady's due process claim arising from
his placement in a Total Separation Unit on the ground that Brady
23     failed to allege facts sufficient to show punitive intent on the part of
any defendant. However, Brady alleged that the reasons given for his
24     placement in the Total Separation Unit did not justify such a
restrictive housing designation. Liberally construed, these
25     allegations are sufficient to state a plausible due process claim. See
Bell v. Wolfish, 441 U.S. 520, 535 (1979) (pretrial detainees have a
26     substantive due process right to be free from restrictions that amount
to punishment); Valdez v. Rosenbaum, 302 F.3d 1039, 1045-46 (9th

28  [15]  See Demery v. Arpaio, 378 F.3d 1020, 1029 (9th Cir. 2004), and discussion infra.

21

Cir. 2002) ("[P]unitive intent can be inferred from the nature of the restriction. This determination . . . will generally turn upon whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether the restriction appears excessive in relation to the alternative purpose assigned to it." (citations and quotation marks omitted)).

ECF No. 32 at 2-3.

At the screening stage, when plaintiff's pleading was entitled to a measure of deference, neither this court nor the Court of Appeals questioned whether Claim One was appropriately framed as a Fourteenth Amendment challenge to the conditions of pretrial detention.

On summary judgment, defendants assert that the Eighth Amendment governs Claim One, because plaintiff was a convicted felon already serving a criminal sentence at the time he was being held at the jail. ECF No. 61-1 at 14. Plaintiff contends in opposition that because he was housed at the jail due to to his federal pretrial status, Fourteenth Amendment standards govern. He argues these standards were violated because his placement was punitive in nature, and that punitive intent is demonstrated by defendants' disregard of the jail's own placement standards, the stated reasons for plaintiff's placement, and the harsh conditions in ADSEG-1. ECF No. 64.

2. Governing Constitutional Standards

a. The "Dual Status" Problem

"The status of the detainee[] determines the appropriate standard for evaluating conditions of confinement." Vazquez v. County of Kern, 949 F.3d 1153, 1163 (9th Cir. 2020) (quoting Gary H. v. Hegstrom, 831 F.2d 1430, 1432 (9th Cir. 1987). Here, plaintiff was a state inmate already serving a life sentence at the time he was housed at the Sacramento County Jail in relation to a pending federal prosecution. Accordingly, he was both a sentenced prisoner and a pretrial detainee.

A challenge to conditions of confinement brought by a person serving a criminal sentence is governed by the Eighth Amendment, which assumes the propriety of punishment pursuant to the sentence and prohibits only those punishments which are "cruel and unusual." See Rhodes v. Chapman, 452 U.S. 337, 344-347 (1981). In general, a pretrial detainee has greater rights than a convicted inmate because he has not been sentenced and therefore may not be "punished." Bell

22

1  v. Wolfish, 441 U.S. 520, 535 & n. 16 (1979); Kingsley v. Hendrickson, 576 U.S. 389, 400

2  (2015) ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less

3  'maliciously and sadistically.'").  The various rights of pretrial detainees are grounded in the

4  Fourteenth Amendment's guarantee of substantive due process.  Valdez v. Rosenbaum, 302 F.3d

5  1039, 1045 (9th Cir. 2002).  Where Fourteenth Amendment standards apply, conditions which

6  amount to punishment are forbidden.  Bell, 441 U.S. at 535; Demery v. Arpaio, 378 F.3d 1020,

7  1023 (9th Cir. 2004).  Punitive intent is an essential element of a pretrial detainee's claim.

8  Demery, 378 F.3d at 1029.  Neither a condition's characterization as punishment nor the

9  defendant's punitive intent has any relevance to an Eighth Amendment claim, however, because

10  punishment is a legitimate goal of criminal sentencing.  Restrictive or even harsh conditions of

11  confinement are contemplated by a sentence of incarceration.  See Rhodes, 452 U.S. at 347.

12        Perhaps surprisingly, the Ninth Circuit has not addressed the question whether Eighth or

13  Fourteenth Amendment standards govern a conditions of confinement claim brought by a

14  prisoner serving a criminal sentence who challenges conditions at a facility where he is being held

15  pretrial on new charges.  When faced with such "dual status" plaintiffs, other courts have found

16  that the Eighth Amendment provides the appropriate constitutional framework.  See Laza v.

17  Reish, 84 F.3d 578, 580 (2d Cir. 1996) ("Because [plaintiff] had not completed his state sentence

18  when he was segregated at Otisville, [plaintiff] was not a [federal] pre-trial detainee entitled to the

19  procedural protections in Bell v. Wolfish."); Munz v. Michael, 28 F.3d 795, 798 (8th Cir. 1994)

20  (holding that plaintiff, a state prisoner released into the custody of federal authorities pursuant to

21  a writ of habeas corpus ad prosequedum, was protected under the Eighth Amendment because the

22  "issuance of [a] writ of habeas corpus ad prosequedendum does not alter [the defendant's]

23  custody status.  It merely change[s] the location of his custody for the sentence he was already

24  serving" (citations omitted) (alterations in original)); Joost v. Cornell Corr., Inc., 1998 WL

25  939531 at *2, 1998 U.S. Dist. LEXIS 23097 (D.R.I. Dec. 11, 1998) (Eighth Amendment applies

26  to claim of sentenced prisoner awaiting trial on a new charge); Miller v. Ninkovic, 2017 WL

27  244846 at *1, 2017 U.S. Dist. LEXIS 8147 at *3-4 (E.D. Wis. Jan. 20, 2017) (Eighth Amendment

28  governs claim of state prisoner who was in county jail awaiting trial on new charges);  Ulrich v.

1    West, 2022 WL 18492158 at *2, 2022 U.S. Dist. LEXIS 236761 at *5 (W.D. Okla. Nov. 22,

2    2022), report and recommendation adopted, 2023 WL 425400, 2023 U.S. Dist. LEXIS 13400

3    (W.D. Okla. Jan. 26, 2023) (same).[16]

4       The undersigned finds these cases persuasive.  As the Miller court noted, plaintiff "did not

5    lose his status as a convicted prisoner merely because he was transferred to a different location,

6    nor does he get enhanced constitutional rights simply because he is alleged to have committed

7    additional crimes for which he had not yet been tried."  Miller, 2017 U.S. Dist. LEXIS 8147 at

8    *4.  Or as the Joost court put it, "To the extent that [plaintiff's] status as a convicted prisoner

9    versus a pretrial detainee is otherwise relevant, plaintiff's argument that he [] occupies a dual

10   status is not persuasive. [Plaintiff's] recidivism does not enhance his constitutional rights.  The

11   fact that … he was awaiting retrial on the firearm charge does not obviate the fact that he was also

12   imprisoned as a convicted felon."  Joost, 1998 U.S. Dist. LEXIS 23097 at *8.  The same is true

13   here.

14      Plaintiff was serving a life sentence at the time he was transferred to Sac Jail for federal

15   prosecution, and he continued to serve that sentence while in federal custody.  As a person

16   serving a criminal sentence, he had no right not to be punished.  The fact that he was in pretrial

17   status related to new charges did not serve to suspend his prior sentence, nor did it transform him

18   into a purely pretrial detainee who had been convicted of nothing.  Accordingly, the undersigned

19   finds that plaintiff can defeat summary judgment on his challenge to his ADSEG-1 placement

20   only if there are triable issues of fact as to a violation of his Eighth Amendment rights.  See

21   Miller, supra (granting defendant's motion for jury instruction on Eighth Amendment standards

22   and denying plaintiff's motion for jury instruction on Fourteenth Amendment standards).

23

---

24   [16]  There is a split of opinion on the question whether the Eighth Amendment applies when a
     parolee or probationer is arrested and detained on new law violations.  See, e.g., Dannebaum v.

25   County of San Diego, 2016 WL 2931114 at *3, 2016 U.S. Dist. LEXIS 66295 at *8 (S.D. Cal.
     May 17, 2016) (Fourteenth Amendment applies); Rankin v. Klevenhagen, 5 F.3d 103, 106 (5th

26   Cir. 1993) (Eighth Amendment applies).  The undersigned does not find these cases analogous
     because the plaintiff parolees and probationers, though still technically under criminal sentence,

27   were at large in the community rather than serving a custodial sentence when taken into pretrial
     detention.  Accordingly, the detentions at issue were themselves warranted solely on pretrial

28   grounds.  That is not the case here.

1          b. Applicable Eighth Amendment Standards

2          The conditions under which a prisoner is confined constitute part of his punishment, and

3  therefore may not involve the wanton and unnecessary infliction of pain or otherwise constitute

4  cruel and unusual punishment under established Eighth Amendment jurisprudence.  Rhodes v.

5  Chapman, 452 U.S. 337, 347 (1981).  "[C]onditions that cannot be said to be cruel and unusual

6  under contemporary standards are not unconstitutional.  To the extent that such conditions are

7  restrictive and even harsh, they are part of the penalty that criminal offenders pay for their

8  offenses against society."  Id.

9          "[A] prison official violates the Eighth Amendment only when two requirements are met."

10  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  "First, the deprivation alleged must be,

11  objectively, 'sufficiently serious.'"  Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  To

12  be sufficiently serious, "a prison official's act or omission must result in the denial of 'the

13  minimal civilized measure of life's necessities.'"  Id. (quoting Rhodes, 452 U.S. at 347).  These

14  minimum requirements include "food, clothing, shelter, sanitation, medical care, and personal

15  safety."  Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  "[R]outine discomfort

16  inherent in the prison setting" does not rise to the level of a constitutional violation.  Johnson v.

17  Lewis, 217 F.3d 726, 731 (9th Cir. 2000).  Rather, "extreme deprivations are required to make out

18  a[n] [Eighth Amendment] conditions-of-confinement claim."  Hudson v. McMillian, 503 U.S. 1,

19  9 (1992).  Placement in administrative segregation does not, without more, rise to the level of an

20  Eighth Amendment violation.  See Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir.

21  1995) ("administrative segregation, even in a single cell for twenty-three hours a day, is within

22  the terms of confinement ordinarily contemplated by a sentence").

23          Second, the prison official must subjectively have a sufficiently culpable state of mind.

24  Farmer, 511 U.S. at 834.  This element is satisfied where the official acts unnecessarily and

25  wantonly for the purpose of causing harm, id., or with deliberate indifference to inmate health and

26  safety, id. at 847.

27  ////

28  ////

25

1        3. <u>Undisputed Facts</u>[17]

2           a. <u>Plaintiff's Housing Designation</u>

3        Plaintiff was serving a life sentence in the custody of the California Department of

4 Corrections and Rehabilitation when he was federally charged with RICO conspiracy and related

5 charges. DSUF No. 1; ECF No. 61-4 at 87-88 (Pl's Depo. 85:22-86:7). The indictment alleged

6 that plaintiff was an Aryan Brotherhood member who, while in state custody, participated in a

7 racketeering conspiracy that involved murder and drug distribution, and that plaintiff had

8 personally murdered another prisoner as part of that conspiracy. <u>See</u> Pl's RICO case, ECF No.

9 1.[18] The charges carried the possibility of the death penalty. On June 28, 2019, plaintiff was

10 transferred from High Desert State Prison to Sacramento County Main Jail (Sac Main Jail), in the

11 custody of the U.S. Marshal, for purposes of the federal prosecution. DSUF No. 1; <u>see also</u>

12 DSUF Nos. 6, 7.

13        Upon arrival at Sac Main Jail, plaintiff's housing classification was determined using an

14 Intake Classification form. ECF No. 61-5 at 29-30 (Pl's Jail File). Plaintiff was placed in

15 ADSEG 1 by defendants Saika and Headly. DSUF Nos. 1, 9, 11. Defendant Headly works under

16 defendant Saika. DSUF No. 11. The decision to house plaintiff in ADSEG 1 was made in

17 consultation with AUSA Jason Hitts and the California Department of Corrections and

18 Rehabilitation. DSUF No. 11.

19        ADSEG 1 is a housing designation that includes total separation from other inmates,

20 eating in an individual cell, restricted out-of-cell time, and inability to participate in programming

21 with other inmates. DSUF Nos. 9, 10. Four AB coconspirators, who were part of AB leadership,

22 were also housed in ADSEG 1 at Sac Main Jail. DSUF No. 4. At the time of his incarceration at

23 Sac Main Jail, plaintiff was in line to be a leader of AB. DSUF No. 6.

24        Sac Main Jail is not equipped to house dangerous inmates with high notoriety and

25        _____

26 [17] <u>See</u> fn. 9, <u>supra</u>.

27 [18] On January 3, 2024, plaintiff pled guilty to murder in aid of racketeering. Pl's RICO case, ECF No. 1782; <u>see also</u> ECF No. 61-4, Pl's Depo, Exhibit 6, at 156 (plaintiff admitted "he

28 willfully, deliberately, and with premeditation, murdered Donald Pequeen to maintain his status with the Aryan Brotherhood and enforce its code").

criminal sophistication for long periods of time.  DSUF No. 12.  Jail staff determined that housing plaintiff in ADSEG 1 was the safest designation for other inmates and jail employees based on his history.  DSUF No. 12.  There was a concern that plaintiff or any of the other AB members might murder one another to prevent them from testifying against their fellow coconspirators.  DSUF No. 12.  Plaintiff's charges included stabbing another inmate with a knife in furtherance of racketeering.  DSUF No. 12.

The following factors were used to determine that plaintiff should be housed in ADSEG 1: (1) AB members are extremely violent and pose a security risk to Sheriff's Deputies and Jail staff when handling more than one AB member assigned to a cell; (2) AB members go by a code of ethics known as "Blood in and Blood out."  That is, to leave AB is upon death only; (3) federal prosecutors anticipated that one of the AB members housed at the Jail might flip and testify against his fellow AB members in Sac Main Jail.  The potential of an AB member flipping would put the flipping member at risk of assassination; (4) AB is an extremely sophisticated gang with the ability to communicate inside and outside correctional facilities as demonstrated by the pending RICO charges.  DSUF No. 12.

On June 17, 2021, July 1, 2021, July 13, 2021, July 29, 2021, September 8, 2021, November 20, 2021, and March 6, 2022, plaintiff's housing was reviewed by completing a two-page Leveraged Events form.  ECF No. 61-5 at 34-35, 42-43, 45-46, 53-64.  The Leveraged Event forms have designations for "Event," "Class Level," and "Class Reason."  Id.  On all forms, the "Event" and "Class Level" listed for plaintiff was "ADSG1."  Id.  Several did not indicate "Class Reason," id. at 34, 42, 45, 62, 64, while others marked the options "Affiliated with known terrorist group" and/or "High Notoriety."  Id. at 54, 56, 58, 60.  Plaintiff remained housed in ADSEG 1 at Sac Main Jail for three and a half years.  DSUF No. 5.  On March 23, 2022, while his federal charges were still pending, plaintiff was transferred out of Sac Main Jail.  DSUF No. 5.

b. Pertinent Provisions of the Mays Consent Decree

Plaintiff's opposition to defendants' motion for summary judgment repeatedly cites to Mays v. Sacramento County, No. 2:18-cv-2081 TLN CSK (E.D. Cal.) ("Mays").  The

27

1   undersigned finds it appropriate to take judicial notice of the proceedings and consent decree in

2   Mays. See Fed. R. Evid. 201(b)(2); United States ex rel. Robinson Rancheria Citizens Council v.

3   Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992).

4        The Mays Consent Decree states,

> The Remedial Plan is designed to meet the minimum level of mental and medical health care necessary to fulfill Defendant's obligations under the Eighth and Fourteenth Amendments, to avoid the unlawful use of segregated or restrictive housing in the jails, as well as to ensure non-discrimination against people with disabilities in the areas addressed by the Remedial Plan, as required by the ADA and Section 504 of the Rehabilitation Act.

9   Mays, ECF No. 85-1 ¶ 10; Id., ECF No. 110 at 2.  When the court approved and adopted the

10  Mays Consent Decree it also granted the parties' Joint Motion for Final Approval of Class Action

11  Settlement, which states that although the Decree has language "that limits its use in other claims

12  or proceedings, nothing limits any litigant from accessing or referencing the policies and

13  procedures adopted by the County in connection with or in response to the Mays Consent Decree,

14  or the evidence submitted in support of Plaintiff's claims." See Mays, ECF No. 102 at 9.

15        Section VIII of the Mays Consent Decree concerns segregation and restrictive housing.

16  Mays, ECF No. 85-1 at 66-76.  Administrative Segregation Phase I is the "most restrictive

17  designation for prisoners in Administrative Segregation."  Id. at 72.  Prisoners in Administrative

18  Segregation Phase I "shall be offered a minimum of one hour per day out of cell time for a total

19  of seven hours per week" and "shall be offered an opportunity for Out-of-Cell Activities for at

20  least five or seven hours per week."  Id.  "Out-of-cell time with the opportunity to exercise shall

21  be provided to each prisoner seven (7) days per week, including outdoors/recreation time when

22  feasible."  Id. at 67.

23        "Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages

24  in new conduct warranting retention in Administrative Segregation as specified in Section

25  VIII.E.1.b."  Id. at 72-73.  Section VIII.E.1.b. states

> The County may use Administrative Segregation in the following circumstances: i. Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. . . . ii. During a brief

1

2

investigation period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

3    Id. at 73.  "The County will not operate Protective Custody units with Segregation-type

4    conditions of confinement.  Prisoners placed in Protective Custody shall have the same programs

5    and privileges as general population prisoners, absent exceptional circumstances that are

6    documented."  Id. at 73-74.

7        Judicial notice means that the court accepts the fact that the Consent Decree says what it

8    says and was in place at the time plaintiff was housed at the Sac Main Jail.  It does not mean that

9    the Consent Decree has any particular relevance or evidentiary weight in the present context.

10        4.  Analysis

11        The court notes first that the Mays Consent Decree does not establish the standard which

12   governs plaintiff's claim.[19]  Section 1983 provides remedies for violations of constitutional rights,

13   not for violation of court orders or institutional policies, including those policies adopted pursuant

14   to a consent decree.  See Case v. Kitsap County Sheriff's Dep't, 249 F.3d 921, 930 (9th Cir.

15   2001) ("[T]here is no § 1983 liability for violating prison policy.  [Plaintiff] must prove that [the

16   official] violated his constitutional right . . . .") (quoting Gardner v. Howard, 109 F.3d 427, 430

17   (8th Cir. 1997)); see also See Vera v. Warden, No. 1:22-cv-0893 KES CDB, 2024 WL 3012539

18   at *12, 2024 U.S. Dist. LEXIS 103174 at *35 (E.D. Cal. June 10, 2024) ("A consent decree or

19   remedial plan is not a source of federal law that can be vindicated under [§ 1983].");  Hopkins v.

20   California, No. 2:20-cv-2084 KJM AC, 2021 WL 6135925 at *4, 2021 U.S. Dist. LEXIS 247779

21   at *10 (E.D. Cal. Dec. 29, 2021) ("Any right that plaintiff has to legal assistance under state law,

22   prison policy, or a consent decree is not a right based in the Constitution or other federal law and

23   cannot support a claim for damages under § 1983.").

24        This court need not reach the question whether, even assuming a failure to follow the

25   ────────────────

26   [19]  For this reason, the court sustains defendants' objection to plaintiff's Exhibit B (ECF No. 64 at
      32-6), a Monitoring Report critical of the Jail's compliance with the segregated housing

27   provisions of the Decree.  Even if plaintiff could lay a proper foundation and proffer non-hearsay
      opinion testimony from the report's authors (who were the Mays plaintiffs' counsel rather than an

28   independent monitor), the report's conclusions regarding compliance would not be relevant to the
      distinct question whether plaintiff's ADSEG-1 housing violated the Eighth Amendment.

1   Mays Consent Decree in housing plaintiff in ADSEG-1, such failure raises a triable issue of fact

2   as to any defendant's culpable state of mind—the only element of an Eighth Amendment

3   violation to which it might theoretically be relevant.  That is because, for the reasons now

4   explained, plaintiff cannot establish the first, objective prong of his Eighth Amendment claim:

5   that his placement and retention in ADSEG-1 was the sort of extreme deprivation which violates

6   the Eighth Amendment's guarantee of the *minimum* civilized measure of life's necessities.  See

7   Hudson, supra, 503 U.S. at 9; Rhodes, supra, 452 U.S. at 347.

8          It is well established that administrative segregation,[20] even when it involves confinement

9   in a single cell for twenty-three hours a day, comes within the terms of confinement ordinarily

10  contemplated by a criminal sentence and therefore does not amount to a "serious" deprivation for

11  Eighth Amendment purposes.  See Anderson v. County of Kern, supra, 45 F.3d at 1316 (citing

12  Toussaint v. McCarthy, 801 F.2d 1080, 1091-92 (9th Cir. 1986)).  In Anderson, the Ninth Circuit

13  overruled the district court and found that indeterminate confinement in administrative

14  segregation, including the blanket denial of opportunities for segregated inmates to exercise or

15  use the day room together, did not constitute cruel and unusual punishment.  Id. at 1315-1316.

16  This rule has been regularly followed.[21]  Anderson and progeny defeat plaintiff's contention that

---

17  [20] "Administrative" segregation is, by definition, distinct from segregation imposed as a penalty

18  for misconduct while in custody.  Certain procedural protections apply to the latter which do not
    apply to the former.  See Wolff v. McDonnell, 418 U.S. 539, 564-67 (1974).  Plaintiff here

19  specifically alleges that he was *not* placed in ADSEG-1 because of any conduct at Sac Mail Jail.
    Accordingly, the procedural protections recognized in Wolff have no application here (and in any

20  case, plaintiff does not seek relief for a violation of procedural due process but for allegedly
    inappropriate confinement in ADSEG-1).  Eighth Amendment caselaw addressing

21  "disproportionate" punishments for disciplinary violations is equally inapplicable.  See, e.g.,
    Allen v. Nelson, 354 F. Supp. 505, 510-11 (N.D. Cal.) ("the language of the Eighth Amendment

22  itself is expressed in words of proportionality. Thus, where punitive segregation is imposed for
    violation of prison rules, the issue often becomes whether the prison penalty is disproportionate to

23  the offense."), aff'd, 484 F.2d 960 (9th Cir. 1973).

24  [21] See, e.g., Collins v. Williams, 536 F. App'x 706, 707 (9th Cir. 2013) (citing Anderson for the
    proposition that administrative segregation does not violate the Eighth Amendment); Perkins v.

25  Crum, 476 F. App'x 136, 137 (9th Cir. 2012) (same); Ruiz v. Cate, 436 F. App'x 760, 761 (9th
    Cir. 2011) (same); Amadeo v. Castellaw, 371 F. App'x 763, 764 (9th Cir. 2010) (same); Mitchell

26  v. Minkin, 178 F.3d 1300 n.4 (9th Cir. 1999) (unpublished) (same); Moreno v. Vaca, 2023 U.S.

27  Dist. LEXIS 37240, at *11, 2023 WL 4291800 (C.D. Cal. Mar. 2023) (same); Stafford v. Doss,
    2021 U.S. Dist. LEXIS, at * 32, 2021 WL 3563490 (E.D. Cal., Aug. 2021) (same); Killensworth

28  (continued…)

1   his rights were violated by his total separation from other inmates and highly restricted out-of-cell

2   time.

3           The Anderson court also held that "prison officials have a legitimate penological interest

4   in administrative segregation, and they must be given 'wide-ranging deference in the adoption

5   and execution of policies and practices that in their judgment are needed to preserve internal order

6   and discipline and to maintain institutional security.'" Id. (quoting Bell, supra, 441 U.S. at 546-

7   547). The court accordingly found no constitutional barrier to the administrative segregation

8   under highly restrictive conditions of inmates who, like plaintiff here, were considered "high

9   notoriety" and/or deemed to pose serious security risks. Anderson, 45 F.3d at 1315-1316. This

10  holding defeats plaintiff's contention that the Constitution forbade his placement in ADSEG-1 on

11  the grounds stated by Sac Main Jail officials.[22]

12          Under established Circuit precedent, plaintiff has failed to raise a disputed issue of

13  material fact as to whether his placement and retention in ADSEG-1 objectively constitutes a

14  "serious" deprivation within the meaning of the Eighth Amendment.[23] Accordingly, defendants

15  _____

16  v. Godfrey, 2019 U.S. Dist. LEXIS 185124, at *13, 2019 WL 5455717 (C.D. Cal. Oct. 24, 2019)
    (same); Ernest v. Davis, 2017 U.S. Dist. LEXIS 227528, 2017 WL 11435162, at *4 (N.D. Cal.
    Mar. 20, 2017) (same); France v. Allman, 2016 U.S. Dist. LEXIS 178843, 2016 WL 7439577, at
17  *3 (N.D. Cal. Dec. 27, 2016) (same); Arizmendi v. Seman, 2015 U.S. Dist. LEXIS 99890, 2015
    WL 4572430, at *16 (N.D. Cal. July 29, 2015) (same); Phillips v. Bramucci, 2015 U.S. Dist.
18  LEXIS 94236, 2015 WL 4452142, at *6 (N.D. Cal. July 20, 2015) (same); Viera v. Lewis, 2014
    U.S. Dist. LEXIS 106902, 2014 WL 3853142, at *4 (N.D. Cal. Aug. 4, 2014) (same); Ferrera v.
19  Lewis, 2013 U.S. Dist. LEXIS 103048, 2013 WL 3829264, at *7 (N.D. Cal. July 23, 2013)
    (same); Anderson v. Deleon, 2013 U.S. Dist. LEXIS 32610, 2013 WL 892276, at *4 (N.D. Cal.
20  Mar. 8, 2013) (same); Shotwell v. Brandt, 2012 U.S. Dist. LEXIS 178386, 2012 WL 6569402, at
    *3 (N.D. Cal. Dec. 17, 2012) (same); McLaughlin v. Felker, 2011 U.S. Dist. LEXIS 132319, at
21  *9, 2011 WL 5593005 (E.D. Cal. Nov. 2011) ("As a matter of law, the placement of an inmate in
    administrative segregation does not constitute cruel and unusual punishment.") (citing Anderson).
22  [22] In effect, plaintiff's placement in Sac Main Jail's ADSEG-1 was the equivalent of placement in
    a California state prison SHU. The Ninth Circuit has approved the assignment of suspected gang
23  members and affiliates to SHU as a matter of administrative discretion. Munoz v. Rowland, 104
    F.3d 1096, 1098 (9th Cir. 1997); see also Griffin v. Gomez, 741 F.3d 10, 21 (9th Cir. 2014) (state
24  prison placement in administrative segregation does not violate Eighth Amendment).
    [23] The court notes further that there is no evidence to support the subjective prong of an Eighth
25  Amendment claim: that any defendant acted wantonly with an intent to harm plaintiff, or with
26  deliberate indifference to a known threat to his health and safety. Even if jail officials knowingly
    placed and retained plaintiff in ADSEG-1 in violation of the standards and/or procedures required
27  (continued…)

28

31

1    are entitled to summary judgment on Claim One.

2        D.   Claims Two and Three

3          1.  Overview

4       In Claim Two, plaintiff alleges that his meetings with his lawyers and other defense team

5    members in Booth R, the 8 West legal visiting booth, could be overheard from outside the booth

6    in violation of plaintiff's First Amendment right to confer confidentially with counsel.  Plaintiff

7    alleges that he experienced a "chilling effect" and was deterred from speaking freely because he

8    knew his conversations were not confidential.  ECF No. 16 at 13-16.  Claim Three alleges that

9    four of plaintiff's confidential meetings, two with counsel and two with a defense investigator,

10    were recorded by a camera that had been installed in Booth Q when it was changed from a legal

11    visiting booth to a social visiting booth.  Id. at 16-19.  Knowledge of the camera and later

12    acknowledgement by defendants of actual recording further chilled plaintiff's exercise of his right

13    to speak confidentially with his defense team.  Id. at 19.

14       Defendants move for summary judgment on the primary grounds that (1) there is no

15    evidence that defendants or anyone else actually overheard any privileged conversations, or that

16    plaintiff's criminal case was prejudiced; (2) defendants had a legitimate penological interest in

17    converting Booth Q into a social visiting booth, which is why a camera was installed; (3)

18    defendants cannot be liable under § 1983 for "inadvertent" recording of legal visits; and (4)

19    defendants are entitled to qualified immunity.

20         2.  Governing Constitutional Standards

21       "A criminal defendant's ability to communicate candidly and confidentially with his

22    lawyer is essential to his defense."  Nordstrom v. Ryan, 762 F.3d 903, 910 (9th Cir. 2014).

23    Indeed, "the right to privately confer with counsel is nearly sacrosanct."  Id.  The First

24    Amendment is one of several constitutional provisions that protects the confidentiality that is

25    necessary to the effective assistance of counsel and thus to the exercise of all other constitutional

26

27    by jail policy or the Mays Consent Decree, the undisputed evidence is that they did so because of

    plaintiff's notoriety, gang affiliation, and dangerousness.  This subjective intent is inconsistent

28    with Eighth Amendment liability.

1   rights of the criminally accused.  See id. at 909; Hayes v. Idaho Correctional Center, 849 F.3d

2   1204, 1211 (9th Cir. 2017) (holding that prisoners have a protected First Amendment interest in

3   having legal mail opened only in their presence).  A plaintiff alleging a violation of First

4   Amendment rights is not required to show injury other than the chilling of protected speech.

5   Laird v. Tatum, 408 U.S. 1, 11 (1972).  This principle applies in the context of an inmate

6   claiming infringement of the right to communicate confidentially with counsel.  Hayes, 849 F.3d

7   at 1212.[24]

8           3.  Undisputed Facts[25]

9               a.  8 West Visiting Generally

10  There are eight visiting spaces in 8 West at Sac Main Jail, ECF No. 61-5 at 74 (Shaun

11  Hampton Declaration ("Hampton Decl.") ¶ 5), which are labeled J, K, L, M, N, O, P, Q, and R.

12  ECF No. 64 at 137 (Benny Memo).  Booth O is next to Booths N and P, Booth P is next to

13  Booths O and Q, and Booth R is in the next to Booth Q.  See id.; ECF No. 61-4 at 68 (Pl's Depo.

14  66:1-6); ECF 64 at 126 (Pl's photos of 8 West visiting area).  Visiting slots P and O are the two

15  closest social visiting slots to Booths Q and R.  ECF No. 64 at 137 (Benny Memo).  Booth Q is

16  closer to Booth R than are Booths O and P.  Id. at 69 (Pl's Depo. 67:20-24).

17              b.  Booth R

18  Booth R was designated for confidential visits, including attorney-client visits, throughout

19  the relevant period.  In February 2020, plaintiff filed a grievance complaining that during the

20  course of a legal visit in Booth R, he "could clearly hear the people in Booth 'Q'."  ECF No. 61-4

21  at 134 (grievance dated Feb. 13, 2020); id. at 67 (Pl's Depo. 65:12-25).  He requested a visiting

22  booth that is soundproof and confidential.  ECF No. 61-4 at 134 (grievance).  The grievance

23  response indicated that the issue had been "Resolved" and stated the following: (1) Booths O and

24  P, which are social visit booths, were recently shut down; (2) there will therefore be no social

25  _____

26  [24]  The same standard applies to a claimed violation of the Sixth Amendment right to confidential
    communication with counsel.  See Mangiaracina v. Penzone, 849 F.3d 1191, 1196, 1198 (9th Cir.

27  2017) (chilling effect sufficient to support claim that inmate's mail from counsel was opened
    outside his presence in violation of Sixth Amendment).

28  [25]  See fn. 9, supra.

visits happening in the booths directly next to the attorney booths; (3) shutting down Booths O and P should help with being able to hear what is being said on a social visit; (4) "I recommend lowering your voice if it is a concern that someone will hear your conversation"; and (5) "[t]he attorney booths on the 8th floor are not going to be further soundproofed at this time." Id. at 135. Booths O and P were closed in response to plaintiff's grievance. ECF No. 61-5 at 74-75 (Hampton Decl. ¶ 12).

Plaintiff has presented percipient lay witness testimony that conversations in Booth Q and R could be heard from adjacent booths and other locations external to the booths. ECF No. 64 at 102-124 (Pl's witness declarations); id. at 135-137 (Benny memo). Defendants state in their moving papers that they conducted sound checks on the booths which determined that no communications could be overheard. EC F No. 61-1 at 20. This statement contains no citation to evidence, and Defendants' Separate Statement of Undisputed Facts, ECF No. 61-2, contains no reference to such testing.[26]

c. Booth Q

Originally, Booth Q had been used for confidential visits including legal visits. ECF No. 61-5 at 74 (Hampton Decl. ¶ 6). In June 2019, Booth Q was redesignated by jail authorities as a social visitation booth. ECF No. 61-5 at 74 (Hampton Decl. ¶ 7); DSUF No. 25. This change was intended to allow high-security inmates to continue their social visits uninterrupted while inmates with other classifications were being moved or escorted around the housing unit. DSUF No. 24. "Confidential" signage on Booth Q was removed and replaced with laminated signage advising visitors that the booth was not confidential; however, this signage was removed by an unknown person or persons at an unknown time. ECF No. 61-5 at 74 (Hampton Decl. ¶ 8); ECF No. 61-4 at 142 (inter-departmental memo dated June 29, 2020).

Because using Booth Q for social visits would create some risk, since view inside the

---

[26] The only reference to such testing that the undersigned can find in defendants' evidence is the following statement in Lt. Hampton's declaration: "Subsequent tests performed by deputies found that sound could not be heard from social Booths Q and P from confidential Booths R and J." ECF No. 61-5 at 75 (Hampton Decl. ¶14). Because this statement appears to be hearsay and lacks foundation, and defendants have provided no potentially admissible evidence of any testing, the statement is disregarded.

1    booth was obscured, cameras were installed as part of a larger project to update cameras

2    throughout the jail.  DSUF No. 24; ECF No. 61-4 at 143 (inter-departmental memo).  The Booth

3    Q camera was among those which "went operational" on April 29, 2020.  ECF No. 61-4 at 143

4    (inter-departmental memo).  Although the cameras have the capability to record video and audio,

5    their audio recording functionality was not enabled.  Id.  The cameras do not have the ability to

6    pan, tilt, or zoom.  Id.

7        When the cameras went operational on April 29, 2020, approximately five employees

8    charged with managing the system had access to them.  Id.  Other Main Jail staff were unaware

9    that the Booth Q installation had been finalized.  Id.

10        On May 20, 2020, all Sac Main Jail personnel were notified that Booth Q was no longer

11    available for use as a confidential visit booth.  Id.; DSUF No. 29.  New laminated signs were

12    posted on the public-side door of the booths, and permanent signage was ordered.  DSUF No. 29.

13        It thereafter came to the attention of commanding officers that Booth Q had been used for

14    legal visits between April 29, when the camera went operational, and May 20, when all personnel

15    were notified that Booth Q was not to be used for confidential visits.  An internal investigation

16    revealed that a total of fourteen attorney and/or professional visits in Booth Q had been recorded

17    after the camera went live.  ECF No. 61-4 at 143 (inter-departmental memo); DSUF No. 32.  Of

18    the fourteen recordings, four were of plaintiff's confidential meetings with his legal team.  ECF

19    No. 61-5 at 74 (Hampton Decl. ¶ 10).  The dates of those recordings were May 5, 10, 16, and 19.

20    Id.  No sound was recorded.  Id.  No attorney-client privileged documents were captured in the

21    video.  ECF No. 61-4 at 143 (inter-departmental memo); DSUF No. 33.

22        4.  Analysis

23        Defendants argue that they are entitled to summary judgment on Claims Two and Three

24    because plaintiff has not identified any evidence that any confidential communications were

25    actually overheard or that his defense of the federal criminal case was prejudiced by the

26    challenged conditions in Booths Q and R.  This argument fails as a matter of law.  Plaintiff has no

27    burden to establish such actual injury or prejudice to his criminal case, as the Ninth Circuit

28    emphasized when reversing and remanding on this point.  See ECF No. 32 at 3 (citing Hayes,

1   supra, for the proposition that a chilling effect on the attorney-client relationship, rather than

2   actual injury to a legal claim, supports relief).  Plaintiff has offered his own testimony as to the

3   chilling effect of knowing that Booths Q and R were not soundproof and that Booth Q had a

4   camera,[27] and this is sufficient to create a triable issue as to injury to his First Amendment rights.

5   See Hayes, 849 F.3d at 1212.[28]

6       Nor does the absence of direct evidence that plaintiff's own conversations were overheard

7   defeat the existence of a factual dispute as to whether plaintiff's right to confidentiality was

8   compromised.  Plaintiff has submitted multiple exhibits, discussed above in relation to

9   defendants' motion to strike, proffering testimony that sound carried to and from the 8 West legal

10  visiting booths during the relevant period.  See ECF No. 64 at 102-124 (Pl's witness

11  declarations);[29] id. at 135-137 (Benny memo).[30]  The substance of this evidence is admissible on

12  the question whether attorney visits were generally confidential on 8 West, and supports an

13  inference that plaintiff's conversations in Booth R were readily capable of being overheard.  This

14  evidence establishes the existence of a triable issue of material fact on the question whether

15  plaintiff's First Amendment rights were violated.

16      As to Claim Three, defendants seek summary judgment on the ground that they had a

17  legitimate penological interest in putting a camera in Booth Q to permit the monitoring of social

18  visits for high security inmates.  It is well established that when a prison or jail regulation

19  impinges on inmates' constitutional rights, the regulation is nonetheless valid if it is reasonably

20  related to legitimate penological interests.  Turner v. Safley, 482 U.S. 78, 89 (1987); Thornburgh

21  ---

[27]  See, e.g., ECF No. 64 at 78-79, 87 (Pl's Depo. at 60:20–61:7, 94:6-19); id. at 106 (Pl's Decl.).

22  [28]  Defendants rely on Lewis v. Casey, 518 U.S. 342, 351 (1996).  ECF No. 65 at 6.  Lewis v.
    Casey establishes the actual injury rule applicable to Sixth Amendment access to court claims.

23  The rule is different for claims alleging simple intrusion on the confidentiality of attorney-client
    communications, whether brought under the First or Sixth Amendments.  Hayes, 849 F.3d at

24  1212; Mangiaracina, 849 F.3d at 1196.

    [29]  Declarations of plaintiff Patrick Brady; co-defendant Jason Corbett; co-defendant Ronald

25  Yandell; co-defendant William Lee Sylvester; paralegal Ashely Benney; paralegal Ashley
    Vasquez; investigator Frank W. Huntington, III; attorney Kresta N. Daly; attorney Marcia M.

26  Morrissey.  For the reasons explained in relation to the motion to strike, the court overrules
    defendants' objections to these declarations.

27  [30]  For the reasons explained in relation to the motion to strike, the court overrules defendants'

28  objection to this exhibit.

1    v. Abbott, 490 U.S. 401, 409 (1989). This rule does not help defendants here, however, because

2    plaintiff does not challenge the policy of monitoring social visits or the installation of a camera in

3    Booth Q for that purpose. Accordingly, defendants' penological interest in doing so is irrelevant.

4    Plaintiff seeks relief for the videorecording of his legal visits, an intrusion which is not logically

5    justified by defendants' legitimate interest in monitoring nonconfidential social visits. Because

6    there is no nexus between the penological interest asserted by defendants and the intrusion on

7    plaintiff's rights that is at issue, defendants' argument fails. See Bradley v. Hall, 64 F.3d 1276,

8    1280 (9th Cir. 1995) (court must "examine the strength of the logical nexus between the

9    penological purpose served and restriction of the prisoner's rights.").

10          Defendants argue further that the recording was unintentional and therefore cannot rise to

11    the level of a constitutional violation. However, the evidence could be construed in plaintiff's

12    favor as reflecting knowledge on the part of defendants that Booth Q was being used for legal

13    visits on 8 West long after its supposed redesignation as a social visiting booth in 2019. For

14    example, plaintiff's February 2020 grievance about the sound issue specifically refers to Booth Q

15    as a legal booth,[31] and the statement of resolution of the grievance repeatedly refers to attorney

16    booths in the plural without indicating that Booth Q is non-confidential. ECF No. 61-4 at 134-

17    135.[32] It is undisputed that Booth Q had historically been used for confidential visits, and that it

18    was not visibly marked as non-confidential at the time the camera "went operational." The

19    installation and activation of a camera in a booth known to be used for confidential legal visits,

20    regardless of its technical designation, could fairly be construed as reflecting a disregard of

21    inmates' rights that exceeds mere negligence.

22    

23    [31]  As previously noted, this grievance reported that when plaintiff was meeting with a mitigation
      specialist in Booth R, he could clearly hear the people meeting in Booth Q "which is another legal
24    booth." ECF No. 61-4 at 134. This informed the jail that Booth Q was in fact being used for
      legal visits even after its designation as a social visiting booth.
25    [32]  Lt. Hampton's declaration states that plaintiff erred in describing Booth Q as a legal booth.
      ECF No. 61-5 at 75. However, he signed a response to plaintiff's grievance which failed to
26    correct the assertion that it was being used as such. ECF No. 61-4 at 135. Plaintiff has provided
      evidence that Booth Q was in fact being used for legal visits by other inmates during the relevant
27    period, see e.g. ECF No. 64 at 117 (Ashley Vasquez Decl.), and jail staff cannot have been
      ignorant of this fact.
28

1   In sum, plaintiff has identified evidence that (1) the confidentiality of attorney client visits
2   on 8 West was compromised during the time he was housed there, both because sound carried
3   from Booths Q and R and because the camera in Booth Q captured video of his confidential
4   meetings, and (2) that he experienced a chilling effect on his attorney-client communications as a
5   result.  If a jury accepted plaintiff's evidence, it could find a violation of his First Amendment
6   rights.  Accordingly, this evidence is sufficient to create triable issues as to the merits of Claims
7   Two and Three, unless defendants are entitled to qualified immunity.

8       5. <u>Qualified Immunity</u>

9           a.    <u>Standard</u>

10   The doctrine of qualified immunity "protects government officials from 'liability for civil
11   damages insofar as their conduct does not violate clearly established statutory or constitutional
12   rights of which a reasonable person would have known.'"  <u>Tibbetts v. Kulongoski</u>, 567 F.3d 529,
13   535 (9th Cir. 2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Even if a
14   constitutional violation occurred, prison officials are entitled to qualified immunity if they acted
15   reasonably under the circumstances.  <u>See</u> <u>Friedman v. Boucher</u>, 580 F.3d 847, 858 (9th Cir.
16   2009); <u>Anderson v. Creighton</u>, 483 U.S. 635, 646 (1987).  Qualified immunity gives government
17   officials breathing room to make reasonable but mistaken judgments, and protects all but the
18   plainly incompetent or those who knowingly violate the law.  <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731,
19   743 (2011) (citations omitted).

20   The qualified immunity analysis involves two parts, determining (1) whether the facts that
21   a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether the
22   right at issue was clearly established at the time of the defendant's alleged misconduct.  <u>Saucier v.</u>
23   <u>Katz</u>, 533 U.S. 194, 201 (2001); <u>see also</u> <u>Bull v. City and County of San Francisco</u>, 595 F.3d 964,
24   971 (9th Cir. 2010).  A right is clearly established only if "it would be clear to a reasonable
25   officer that his conduct was unlawful in the situation he confronted."  <u>Saucier</u>, 533 U.S. at 202;
26   <u>Norwood v. Vance</u>, 591 F.3d 1062, 1068 (9th Cir. 2010).  A case "directly on point" is not
27   required; instead, "for a right to be clearly established, existing precedent must have placed the
28   statutory or constitutional question beyond debate."  <u>Kisela v. Hughes</u>, 584 U.S. 100, 104 (2018)

1    (quoting White v. Pauly, 580 U.S. 73, 79 (2017) (internal quotation marks omitted)).  "Beyond

2    debate" means that every reasonable official would understand that what he is doing is unlawful.

3    See District of Columbia v. Wesby, 583 U.S. 48, 63 (2018); Vos v. City of Newport Beach, 892

4    F.3d 1024, 1035 (9th Cir. 2018).

5                b.        Discussion

6        Because the court has already concluded that a jury could find plaintiff's First

7    Amendment rights were violated, the application of qualified immunity turns on the second

8    prong.  As to the sound issue, it is undisputed that defendants responded to plaintiff's complaints

9    by taking two visiting booths adjacent to Booth R out of use.  This remedial action was a response

10   which could reasonably have been expected to significantly alleviate the risk of confidential

11   conversations being overheard.  Although plaintiff has presented evidence that voices nonetheless

12   carried to a degree that chilled his speech, he has not produced evidence that other people were

13   generally present in the area during his confidential legal visits.  The court has rejected

14   defendants' argument that plaintiff cannot prove a First Amendment violation absent evidence

15   that specific conversations were overheard.  However, the absence of such evidence is relevant to

16   the qualified immunity analysis.  That is because defendants' response to plaintiff's grievances

17   cannot have been unreasonable unless they were aware of circumstances demonstrating an actual

18   and ongoing violation of plaintiff's right to confidentially communicate with his legal team.

19   When prison officials act reasonably under the circumstances, they are entitled to qualified

20   immunity.  Friedman, 580 F.3d at 858.

21       In any event, no clearly established precedent specifically requires the soundproofing of

22   attorney-client visiting booths in jails, which is what plaintiff demanded.  Although the

23   suggestion that plaintiff keep his voice down (ECF No. 61-5 at 74-75) may have reflected a

24   cavalier attitude toward a legitimate grievance, in combination with the decommissioning of

25   Booths O and P it was not an unreasonable response.  The court concludes that defendants'

26   conduct here amounted to no more than a "reasonable but mistaken judgment" about what was

27   required to ensure the constitutionally required degree of confidentiality in Booth R.  The

28   evidence does not support a conclusion that any defendant acted incompetently or in knowing

39

1   violation of the law.  See al-Kidd, 563 U.S. at 743.  Accordingly, defendants are entitled to

2   qualified immunity on Claim Two.

3          As to the camera in Booth Q, the undersigned reaches a different conclusion.  The

4   videorecording of confidential attorney-client meetings, even without audio, is such an obvious

5   violation of a criminal defendant's constitutional rights that no reasonable official could believe it

6   to be permissible.  See Nordstrom, 762 F.3d at 910 (recognizing that "the right to privately confer

7   with counsel is nearly sacrosanct.").[33]  Construing the evidentiary record in plaintiff's favor, as

8   the court must on summary judgment, the evidence is susceptible to the following interpretation.

9   When the camera was installed, signage identifying Booth Q as a non-confidential social visiting

10  booth had been missing for some time.  Booth Q had thereafter continued to be used for attorney-

11  client visits, a fact that cannot have been unknown to jail staff, and was being actively used for

12  such visits by plaintiff and his defense team during the relevant time period.  Lt. Hampton himself

13  was put on notice by plaintiff's grievance of the Booth R issue on February 13, 2020, that Booth

14  Q was actively being used for attorney visits.  See ECF No. 61-4 at134.  The camera was

15  nonetheless activated on April 29, 2020 without advance notice to the staff who worked in 8 West

16  or to ADSEG-1 inmates and their lawyers.  Jail staff were not told to discontinue the use of Booth

17  Q for legal visits until May 20, after four of plaintiff's confidential visits had already been

18  recorded.  DSUF No. 29.

19         To the extent the evidence supports defendants' claim that the recording was unintentional

20  (and there is, to be sure, no evidence that anyone deliberately recorded attorney-client meetings),

21  it also supports a conclusion that the violation of plaintiff's rights was the consequence of not

22  _____

23  [33]  While no precedent specifically prohibits the videorecording by correctional officials of
    attorney-client meetings, that is likely because such recording is so clearly impermissible that the
24  fact pattern rarely arises.  Where a constitutional violation is sufficiently obvious, the lack of
    authority directly on point will not support application of qualified immunity.  See Hope v.
25  Pelzer, 536 U.S. 730, 741-742 (2002) (qualified immunity inapplicable, despite lack of directly
    applicable precedent, because the unlawfulness of chaining inmates to hitching posts in the sun
26  was nonetheless apparent).  Caselaw regarding inmates' rights to confidentiality in legal mail, a
    frequently arising issue, adequately puts correctional authorities on notice of the need to respect
27  the confidentiality of attorney-client communications generally.  See Hayes, 849 F.3d at 1211;
    Nordstrom, 762 F.3d at 910.  The recording of in-person meetings cannot reasonably be construed
28  as less of a constitutional violation than the opening of written correspondence.

1    merely negligence but incompetence, if not outright disregard for the rights of 8 West inmates.

2    See al-Kidd, 563 U.S. at 743 (qualified immunity does not protect incompetence or knowing

3    violation of the law).  At least, the evidence on this point is sufficiently equivocal to defeat the

4    application of qualified immunity on summary judgment.

5        E.    Injunctive Relief

6        The First Amended Complaint seeks injunctive relief to correct the various

7    unconstitutional conditions at the Sacramento County Main Jail to which plaintiff was allegedly

8    subjected.  ECF No. 16 at 22-23.  On March 23, 2002, a year after this action was filed and while

9    plaintiff was still in pretrial status vis-à-vis his federal case, he was transferred out of the Main

10    Jail.  DSUF No. 5.  In April and May 2023, plaintiff filed a notice of change of address indicating

11    that he was then incarcerated at California State Prison – Sacramento.  ECF Nos. 35, 37.  On

12    January 3, 2024, plaintiff pled guilty to murder in aid of racketeering in his federal criminal case.

13    See Pl's RICO case, ECF No. 1782.  On June 10, 2025, plaintiff filed a change of address

14    indicating he is now in federal custody.  See ECF No. 69.

15        "[W]hen a prisoner is moved from a prison, his action [for injunctive relief] will usually

16    become moot as to conditions at that particular facility."  Nelson v. Heiss, 271 F.3d 891, 897 (9th

17    Cir. 2001) (citing Dilley v. Gunn, 64 F.3d 1365, 1368-69 (9th Cir. 1995)); Johnson v. Moore, 948

18    F.2d 517, 519 (9th Cir. 1991) (citing Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir. 1986))

19    (claims for injunctive relief related to conditions of confinement were moot where prisoner was

20    transferred to another facility and "demonstrated no reasonable expectation of returning to [the

21    original facility].").  In the absence of a class action, an exception to the general rule on mootness

22    exists "in cases that are 'capable of repetition, yet evading review.'"  Murphy v. Hunt, 455 U.S.

23    478, 482 (1982) (per curiam).  This exception applies in situations where "(1) the challenged

24    action [is] in its duration too short to be fully litigated prior to its cessation or expiration, *and* (2)

25    there [is] a reasonable expectation that the *same complaining party* [will] be subjected to the same

26    action again."  Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam) (emphasis added).

27        Plaintiff makes a conclusory assertion that he faces a reasonable likelihood of being

28    subject to the same pretrial detention conditions in the future, due to potential appellate

41

1   proceedings or future charges, but this contention is not sufficient to demonstrate a "reasonable

2   expectation or demonstrated probability" of transfer such that his claim is not moot.  See Murphy,

3   455 U.S. at 482 ("The Court has never held that a mere physical or theoretical possibility was

4   sufficient to satisfy the test stated in Weinstein.").[34]  Plaintiff's arguments about systemic issues

5   in the Sacramento County jails does not change the mootness analysis because this case is not

6   proceeding as a class action.  Cf. Sosna v. Iowa, 419 U.S. 393 (1975) (concluding that the action

7   for injunctive relief was not moot because "[a]lthough the controversy is no longer alive as to

8   appellant Sosna, it remains very much alive for the class of persons she has been certified to

9   represent.").

10      Because plaintiff is no longer subject to the conditions he challenges, his request for

11   injunctive relief is moot.  Accordingly, the undersigned recommends that defendants' motion for

12   summary judgment as to injunctive relief be granted.

13                                CONCLUSION

14      For the reasons explained above, it is HEREBY ORDERED that defendants' motion to

15   strike (ECF No. 66) is DENIED.

16      IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment

17   (ECF No. 61) be GRANTED IN PART AND DENIED IN PART as follows:

18      1. GRANTED as to (a) Claim One; (b) Claim Two, on grounds of qualified immunity;

19          and (c) plaintiff's request for injunctive relief, as moot; and

20      2. DENIED as to (a) the defense of non-exhaustion under the PLRA; and (b) Claim

21          Three.

22      These findings and recommendations are submitted to the United States District Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

24   after being served with these findings and recommendations, plaintiff may file written objections

25   [34]  See also Dilley v. Gunn, 64 F.3d 1365, 1369 (9th Cir. 1995) ("Dilley's claim that he might be
26   transferred back to Calipatria some time in the future is 'too speculative' to prevent mootness"
     where he has been reclassified as a Class III inmate, Calipatria does not house Class III inmates,
27   and Dilley would only be reclassified as a Class IV inmate, eligible for transfer to Califpatria, if
     he commits a serious rules violation);  Wiggins v. Rushen, 760 F.2d 1009, 1011 (9th Cir. 1985)
28   ("possibility" of transfer back to prison where claims arose not sufficient to overcome mootness).

                                    42

with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 7, 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE